# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-1046

_____

Katia Guimaraes,               *
                                 *

         Appellant,      *

                                 *   Appeal from the United States
     v.                   *   District Court for the
                                 *   District of Minnesota.

SuperValu, Inc.,            *
                                 *

         Appellee.       *

_____

Submitted: October 18, 2011
Filed: March 23, 2012

_____

Before RILEY, Chief Judge, LOKEN and BENTON, Circuit Judges.

_____

BENTON, Circuit Judge.

     Katia Agiuiar Guimaraes sued her former employer SuperValu, Inc. for national-origin discrimination and retaliation in violation of Title VII of the Civil Rights Act and the Minnesota Human Rights Act (MHRA). *See* **42 U.S.C. §§ 2000e-2(a)(1), 2000e-3(a)**; **Minn. Stat. §§ 363A.08**, **363A.15**. The district court[1] granted

_____

[1]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota.

summary judgment to SuperValu, dismissing all claims with prejudice. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

I.

Guimaraes, a native of Brazil, has dual Brazilian and Canadian citizenship. She speaks English with an accent; her native language is Portuguese. She moved from Brazil to Canada in April 2002 through a skilled-workers program. In October 2005, Albertson's Inc., a grocery retailer, hired her to work in its Boise, Idaho, headquarters as an Assistant Category Manager (ACM). Her review with Albertson's was positive, rating her overall performance "above expectations." SuperValu, a grocery retailer and wholesaler, acquired Albertson's in 2006. Guimaraes accepted an ACM position with SuperValu, relocating to its Minneapolis headquarters in 2007.

Lisa Delia Bautista Grubbs[2] joined SuperValu as a manager in January 2008. She is from Mexico and someone introduced her to Guimaraes, mistakenly stating the two could speak Spanish together. The two laughed at the misunderstanding. Later that day, Grubbs approached Guimaraes about getting lunch together, because Grubbs was new to SuperValu and wanted to meet people. Over lunch, each shared her story of coming here, with Grubbs saying she wanted to go to Brazil.

At Albertson's and SuperValu, Guimaraes worked under an H-1B visa, an employer-sponsored non-immigrant visa allowing temporary residence for specialty workers and requiring renewal after three years. In early 2008, Guimaraes renewed her visa. SuperValu sponsored the renewal, posted her job internally and externally, interviewed U.S. residents, and certified that none were more qualified than

---

[2]Grubbs's name also appears in the record as Lisa Bautista. This opinion will use Grubbs.

Guimaraes. SuperValu also sponsored her application to be a legal permanent resident and receive her "green card."[3]

In March 2008, SuperValu blended its management with Albertson's, in a "SUPERFusion" restructuring. After SUPERFusion, each product's marketing is assigned to a team of three employees: a Business Development Manager (BDM), a Business Support Manager (BSM), and a Business Support Specialist (BSS). The BDM manages the other two, reporting to a Director. Guimaraes became the BSM for the Print Media/Checkout product category. Although the core responsibilities remained the same, Guimaraes's new role as a BSM was broader than as an ACM, requiring wholesale as well as retail marketing. She estimated her workload increased by 20 percent.

In May 2008, Grubbs became Guimaraes's BDM. At about the same time, Guimaraes's annual review was due. Because of the BDM change, Lanny L. Hoffmeyer (her second-level supervisor) completed the review, rating her an overall 3 of 5 or "consistently meets expectations." Grubbs signed the review and discussed it with Guimaraes. Guimaraes received a 9.14 percent merit raise in June.

Once Grubbs began supervising her, Guimaraes disagreed with the assignment of work, believing that Grubbs was giving her tasks meant for either Grubbs or the BSS. Guimaraes, however, waited to raise a complaint, believing the mistakes were due to Grubbs's inexperience and would be corrected.

In July 2008, Grubbs asked Guimaraes to perform a task that Guimaraes particularly believed was meant for Grubbs. Guimaraes responded she already had

---

[3]The parties inconsistently use the term "green card" to refer to lawful permanent residence authorization, and to refer to the temporary H-1B work visa. This inconsistency is immaterial here.

too much on her desk and thought it was Grubbs's responsibility.  At Guimaraes's request, the two met.  Grubbs asked Guimaraes to describe the work on her desk and then told her how to handle it better.  Guimaraes stated that Grubbs was improperly delegating her work and giving unreasonable time frames for tasks.  Grubbs said that the company demands a lot from Guimaraes and the BSS, and that they needed to work harder or be replaced.  Guimaraes responded that she felt threatened and did not think a boss should talk to her employees that way.  Grubbs felt insulted by Guimaraes's response and said she would never talk to her boss like that.  Guimaraes said she was only giving honest feedback (as Grubbs had requested when she became BDM).

The next day, Guimaraes met with Hoffmeyer – who had already heard about the meeting from Grubbs – because she was worried Grubbs may have gotten some things wrong about the need for honest feedback.  He suggested that it was up to Guimaraes, the subordinate, to smooth things over with Grubbs, the boss.  Guimaraes requested that the three of them together address the issues.  Hoffmeyer promised to schedule a discussion within five days, but did not.

After the July meeting, Grubbs's behavior toward Guimaraes changed.  Grubbs often became upset with her; did not help when requested; acted as if she could not understand her and constantly asked her to repeat herself[4]; rolled her eyes, smirked, and walked away when she was speaking; asked her to repeat Grubbs's directions verbatim; and excluded her from meetings with vendors, which made her job more difficult.  Grubbs also began to criticize Guimaraes's job performance, claiming she did not prioritize her work, missed project deadlines, did not promptly reply to emails, and could not communicate effectively.  Grubbs did not treat the BSS, her other subordinate, the same way.  Grubbs never referred to Guimaraes's accent or made derogatory comments about her being from Brazil.

---

[4]Guimaraes states that other people had no trouble understanding her.

Guimaraes again asked Hoffmeyer to schedule a meeting to discuss the issues raised in the July meeting, because her attempts to fix the situation had failed. Hoffmeyer agreed, setting up the meeting on August 19. At that meeting, Grubbs and Hoffmeyer gave Guimaraes a diagram prepared by Grubbs, clarifying the roles of the BDM, BSM, and BSS. Guimaraes was surprised that the meeting did not address what happened in July. She disagreed with Grubbs's characterization of her responsibilities as the BSM, specifically "pulling data," which she considered beneath her pay scale and properly the duty of the BSS.

After the August meeting, Grubbs and Guimaraes were supposed to meet weekly to discuss Guimaraes's need for improvement. Sometimes Grubbs rescheduled or canceled the meetings; it is not clear how many actually occurred. Guimaraes considered them a "set-up," because Grubbs continued to criticize her without giving meaningful assistance. Guimaraes disagreed with the criticism based on her years of experience. At the end of every meeting, Grubbs told Guimaraes she was not improving.

On Friday, October 3, Grubbs met with Richele Lynn Butler,[5] the human resources partner for her department, to discuss Guimaraes's performance issues and to initiate disciplinary action. Butler told Grubbs she was about to leave the office for two weeks to get married and asked whether Grubbs wanted to work with another HR partner or await her return. Grubbs – with Hoffmeyer's input – decided to wait.

Later in October, Hoffmeyer told Guimaraes that Grubbs was still dissatisfied with her performance. He suggested Guimaraes meet with HR to seek out a different position within the company. She met with Katie Held, an HR partner, on October 15. While inquiring about other positions, Guimaraes told Held that Grubbs was

---

[5]Butler's name also appears in the record as Richele Thorson. This opinion will use Butler.

discriminating against her. She did not mention a basis (or any specifics) of the discrimination. Held took notes and told Guimaraes to schedule a meeting with Butler, the HR partner for Guimaraes's department, when she returned from her honeymoon.

On October 20, Butler returned to work, reviewed Held's notes, and decided to investigate before beginning the disciplinary process requested by Grubbs over two weeks before. On October 23, Butler met with Guimaraes, who complained about Grubbs's discriminatory treatment and – for the first time – linked it to her accent and national origin. Specifically, she said that Grubbs's practice of asking her to repeat herself was linked to her accent and that was linked to her national origin. Butler responded, "I'm sorry you think that way." Butler took notes during the meeting, but did not write anything about national-origin discrimination.

The next day, Butler met with Grubbs and Hoffmeyer to investigate Guimaraes's allegations. Butler took notes, which again did not mention national-origin discrimination. Grubbs denied any discrimination or mistreatment of Guimaraes. Hoffmeyer confirmed that Grubbs's expectations for Guimaraes were no different than for any other BSM. Butler ultimately sided with Grubbs and did not further investigate.

Some time in September or October, Grubbs went to lunch with Donna Roberts, another SuperValu employee. Grubbs told Roberts she was "targeting Katia Guimaraes, and that she was trying to get Katia fired and stop Katia's Green Card process." Grubbs then complained about how long it would take to terminate her. She also told Roberts she stood outside the window during the August meeting between Guimaraes and Hoffmeyer to glare at Hoffmeyer and was purposefully cold to him after the meeting in order to show she was upset he was talking to Guimaraes about her. Grubbs boasted that the manipulation worked and he had taken her side. Roberts responded that Grubbs should try to get along with Guimaraes, which

prompted Grubbs to ignore Roberts for weeks. (Roberts did not tell anyone at SuperValu about this conversation until February 2009.)

Because Guimaraes continued to complain about Grubbs's actions, Butler held a mediation session. Grubbs listed her complaints about Guimaraes's performance, and Guimaraes stated her continued frustration. Guimaraes criticized Grubbs's practice of answering her questions by saying, "You should know that" or asking back, "What do you think?" Grubbs explained she was trying to coach Guimaraes how to solve her problems. Guimaraes disagreed with this style of coaching, asking Grubbs for examples.

The next day, Grubbs placed Guimaraes on a Performance Action Plan (PAP), a two-page official warning that she was underperforming with guidelines for improvement. The PAP listed an action plan: Guimaraes was required to (1) reply to all emails in one business day without involving Grubbs or the BSS; (2) break up large projects into smaller pieces and prioritize tasks in order to meet deadlines, or inform Grubbs as soon as possible if a deadline would be missed, (3) complete ad/promo responsibilities timely and accurately with direction from Grubbs, (4) pull, format, interpret, and explain market data, and enroll in an Excel course, and (5) be receptive to feedback and treat Grubbs with respect. The PAP stated, "The consequence of a performance trend that does not meet the minimum requirements of the job and sustain improvement in overall contributions and behavior will lead further [sic] disciplinary action up to and including termination." Per SuperValu policy, an employee's performance under a PAP is evaluated for 30 days. If there is no improvement, a second PAP is given. If there is still no improvement after 30 more days, a third PAP is given. After 30 more days with no improvement, the employee is terminated.

Grubbs alone concluded that the PAP was necessary and determined the areas needing improvement. Butler and Hoffmeyer reviewed the PAP, but did not

investigate the substance of it. Butler and Grubbs went over the PAP with Guimaraes on November 12. Guimaraes disagreed with the alleged deficiencies and stated that the PAP lacked benchmarks to measure her improvement. She also wanted to know if all BSMs were expected to do the same things, stating that, if not, the PAP was clearly discriminatory. She did not mention her national origin or retaliation as the cause of the discrimination. Guimaraes claims Grubbs "routinely" cancelled meetings with her and failed to offer "feedback" or "guidance" under the PAP.

On December 12, Grubbs and Butler met with Guimaraes to tell her that her performance had not improved. They gave her a second PAP, identifying the same issues as the first. Grubbs alone determined that Guimaraes had not improved. Guimaraes refused initially to sign the second PAP, despite the disclaimer that her signature did not indicate agreement. She did return the signed PAP about two weeks later with a handwritten response and a copy of her last performance review. In the response, she questions the PAP's veracity in light of her previous positive reviews, criticizing it as based solely on Grubbs's perceptions. She does not mention national-origin discrimination or retaliation.

On January 14, 2009, Guimaraes went on leave pursuant to the Family and Medical Leave Act (FMLA). During this time, SuperValu underwent an economically-driven reorganization, eliminating several positions in Guimaraes's department, including one BSM position. SuperValu chose the affected employees based on disciplinary status, performance reviews, and seniority – in that order. Guimaraes was identified for termination as the only BSM on a PAP at the time. (Based on her reviews and seniority, if not on a PAP, she would not have been the affected BSM.) Neither Grubbs nor Hoffmeyer played any part in the determination to eliminate a BSM position or the choice of Guimaraes for termination. On February 20, Hoffmeyer and Butler met with Guimaraes – still on FMLA leave – to tell her she would be terminated when she returned. Guimaraes's doctor released her to return to work and, after a 60-day notice, she was terminated on May 15.

While Guimaraes was on FMLA leave, Roberts took her place as BSM for Print Media/Checkouts around January 30. The first thing Grubbs told her was "I can't believe I told you all of those things about [Guimaraes] now that you're going to be reporting to me." Grubbs then proceeded to treat Roberts poorly.[6] Roberts met with Butler on February 11 to discuss her problems working with Grubbs. When Butler "did not seem to care," Roberts reported Grubbs's comments during both the lunch and her first day working for Grubbs. Roberts believed Grubbs was now targeting her due to her knowledge of Grubbs's treatment of Guimaraes. Butler investigated, talking to Grubbs and Hoffmeyer, but ultimately concluded that Grubbs did not make those statements. On March 12, Roberts emailed a SuperValu vice president, listing all her concerns with Grubbs, including the comments about targeting Guimaraes. Roberts was terminated later that day for insubordination, including profanely describing Grubbs to a co-worker.

## II.

This court reviews de novo a grant of summary judgment. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir.) (en banc), *cert. denied*, 132 S. Ct. 512 (2011). Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." **Fed. R. Civ. P. 56(c)(2)**. "On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Torgerson*, 643 F.3d at 1042, *quoting **Ricci v. DeStefano***, 129 S. Ct. 2658, 2677 (2009) (internal quotation marks omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts

---

[6]Roberts lists many of the same types of mistreatment by Grubbs as Guimaraes. However, Grubbs did not ask Roberts to repeat herself or pretend not to understand her.

are jury functions, not those of a judge." *Id.*, *quoting **Reeves v. Sanderson Plumbing Prods., Inc.***, 530 U.S. 133, 150 (2000).

Guimaraes alleges that her termination violated Title VII and the MHRA because it was either the result of national-origin discrimination, or retaliation for her complaints of national-origin discrimination.

A.

Guimaraes alleges that SuperValu discriminated against her based on national origin. Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's . . . national origin." **42 U.S.C. § 2000e-2(a)(1)**. The MHRA makes it "an unfair employment practice for an employer, because of . . . national origin . . . to . . . discharge an employee." **Minn. Stat. § 363A.08, subd. 2**. The same analysis applies to both Title VII and MHRA claims. ***Torgerson***, 643 F.3d at 1043; ***Bahr v. Capella Univ.***, 788 N.W.2d 76, 83 (Minn. 2010).

Guimaraes presents a cat's paw theory, arguing that her placement on the PAP by Grubbs was discriminatory and led to her termination even if Grubbs had no part in the decision to eliminate her position in the reorganization. *See **Amini v. City of Minneapolis***, 643 F.3d 1068, 1075 (8th Cir. 2011) ("If a non-decision-maker performs an act motivated by a discriminatory bias that is intended to cause, and that does proximately cause, an adverse employment action, then the employer is liable under the cat's paw theory of liability."), *citing **Staub v. Proctor Hosp.***, 131 S. Ct. 1186, 1194 (2011).[7]

---

[7]Because Guimaraes does not present a submissible case of national-origin discrimination or retaliation, this court need not determine whether she makes out an adequate case for cat's paw liability.

Guimaraes can survive a motion for summary judgment in one of two ways:

The first is by proof of "direct evidence" of discrimination. Direct evidence in this context is not the converse of circumstantial evidence, as many seem to assume. Rather, direct evidence is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action. *Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64, 66 (8th Cir. 1997). Thus, "direct" refers to the causal strength of the proof, not whether it is "circumstantial" evidence. A plaintiff with strong (direct) evidence that illegal discrimination motivated the employer's adverse action does not need the three-part *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792, 802-03 (1973),] analysis to get to the jury, regardless of whether his strong evidence is circumstantial. But if the plaintiff lacks evidence that clearly points to the presence of an illegal motive, he must avoid summary judgment by creating the requisite inference of unlawful discrimination through the *McDonnell Douglas* analysis, including sufficient evidence of pretext. *See, e.g., Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 971 (8th Cir. 1994).

*Torgerson*, 643 F.3d at 1045, *quoting* **Griffith v. City of Des Moines**, 387 F.3d 733, 736 (8th Cir. 2004).

1.

As direct evidence of discrimination, Guimaraes points to Grubbs's "green card" statement. In her affidavit, Roberts says:

Sometime in September or October of 2008, I had lunch with Lisa Grubbs (then Lisa Bautista). . . . During that luncheon, Lisa told me that she was targeting Katia Guimaraes, and that she was trying to get Katia fired and stop Katia's Green Card process. Even though Lisa had only been working with Katia for a brief period of time – a matter of months

-11-

– she told me that she was setting in motion a process to terminate Katia. Lisa even complained to me about how long it would take to terminate Katia.

The "green card" statement does not show a specific link between placement on the PAP and Grubbs's alleged discriminatory animus toward Guimaraes's national origin. Guimaraes conflates citizenship or immigration status with national origin. Her green card process shows her intent to change her citizenship or immigration status by becoming a lawful permanent resident. True, a reasonable jury could find the "green card" statement evinces an intent to terminate Guimaraes because she is not yet a lawful permanent resident. The Supreme Court has held, however, that while "[a]liens are protected from illegal discrimination" under Title VII, "nothing in [Title VII] makes it illegal to discriminate on the basis of citizenship or alienage." *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 85 (1973); *see also* ***Lixin Liu v. BASF Corp.***, 409 Fed. Appx. 988, 991 (8th Cir. 2011) (per curiam) (unpublished) (rejecting Title VII claim where the plaintiff "conflate[d] national origin and alienage. His employment status was terminated because of his immigration status, not his Chinese ancestry." (citation omitted)).

Guimaraes does not present direct evidence of national-origin discrimination in violation of Title VII or the MHRA. Her claim is properly analyzed under *McDonnell Douglas.*

2.

Under the *McDonnell Douglas* framework, Guimaraes must first establish a prima facie case of discrimination. ***Torgerson***, 643 F.3d at 1046. The burden of production then shifts to SuperValu to "articulate a legitimate, non-discriminatory reason" for its act. *Id.* "[T]he ultimate burden [then] falls on [Guimaraes] to produce evidence sufficient to create a genuine issue of material fact regarding whether

-12-

[SuperValu's] proffered nondiscriminatory justifications are mere pretext for intentional discrimination." ***Id.***, *quoting **Pope v. ESA Servs., Inc.***, 406 F.3d 1001, 1007 (8th Cir. 2005) (first and second alterations in original). Guimaraes's "burden to show pretext 'merges with the ultimate burden of persuading the court that [she was] the victim of intentional discrimination.'" ***Id.***, *quoting **Texas Dep't of Cmty. Affairs v. Burdine***, 450 U.S. 248, 256 (1981). "Proof of pretext, coupled with a strong prima facie case, may suffice to create a triable question of fact." ***Id.*** Guimaraes "retain[s], at all times, the ultimate burden of proof and persuasion that [SuperValu] discriminated against" her. ***Id.***

a.

To establish a prima facie case of discrimination under Title VII and the MHRA, Guimaraes must establish that (1) she is a member of a protected class, (2) she met SuperValu's legitimate expectations, (3) she suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination. ***Pye v. Nu Aire, Inc.***, 641 F.3d 1011, 1019 (8th Cir. 2011). The district court assumed without deciding that Guimaraes had established a prima facie case. SuperValu challenges the sufficiency on appeal, and this court "may affirm the district court's dismissal on any basis supported by the record." ***Mader v. United States***, 654 F.3d 794, 808 n.12 (8th Cir. 2011) (en banc), *quoting **Phipps v. FDIC***, 417 F.3d 1006, 1010 (8th Cir. 2005).

Guimaraes fails to establish the fourth element of her prima facie case. "'The required prima facie showing is a flexible evidentiary standard,' and a plaintiff can satisfy the fourth part of the prima facie case in a variety of ways, such as by showing more-favorable treatment of similarly-situated employees who are not in the protected class, or biased comments by a decisionmaker." ***Pye***, 641 F.3d at 1019, *quoting **Lewis v. Heartland Inns of Am., L.L.C.***, 591 F.3d 1033, 1039-40 (8th Cir. 2010) (internal quotations marks omitted). Guimaraes does not identify a similarly situated

-13-

employee outside of her protected class, who was treated more favorably. She argues that the "green card" statement – along with Grubbs's alleged practice of smirking, asking Guimaraes to repeat herself, and requiring her to repeat Grubbs's directions verbatim – sufficiently raise an inference of national-origin discrimination.

As noted, the "green card" statement refers to her immigration status, not her national origin. Guimaraes argues it should not be read literally, because Grubbs used "green card" as a code word for her national origin. *Cf.* ***Smith v. Fairview Ridges Hosp.***, 625 F.3d 1076, 1085 (8th Cir. 2010) ("[R]acially charged code words may provide evidence of discriminatory intent by sending a clear message and carrying the distinct tone of racial motivations and implications." (alterations and internal quotation marks omitted)), *cert. denied*, 131 S. Ct. 2904 (2011). The "green card" statement is facially neutral as to national origin, and neutral statements, without more, do not demonstrate animus on the part of the speaker. *See* ***Twymon v. Wells Fargo & Co.***, 462 F.3d 925, 934 (8th Cir. 2006); ***Ash v. Tyson Foods, Inc.***, 546 U.S. 454, 456 (2006) (per curiam) ("The speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage."). Nothing about the statement suggests it is charged with national-origin discriminatory animus or carries the distinct tone of such motivation or implication. It is "materially different from the historically racially disparaging but facially-neutral term 'boy' . . . deemed potentially probative of racial animus in [*Ash*, 546 U.S. at 456]." *See* ***Twymon***, 462 F.3d at 934 n.5. No reasonable jury could find that the "green card" statement gives rise to an inference of national-origin discrimination.

Guimaraes also claims that Grubbs's practice of pretending not to understand her, constantly asking her to repeat herself, and requiring her to repeat Grubbs's directions verbatim show she was mocking her accent, which is related to her national origin. True, comments ridiculing an employee's accent may be relevant evidence of national-origin animus. *See* ***Hossaini v. Western Mo. Med. Ctr.***, 97 F.3d 1085,

-14-

1089 (8th Cir. 1996); *cf.* 26 C.F.R. § 1606.1 ("The Commission defines national origin discrimination broadly as including, but not limited to, the denial of equal employment opportunity . . . because an individual has the . . . linguistic characteristics of a national origin group."). However, without more evidence, no reasonable jury could find Grubbs's alleged behavior raises an inference of national-origin discrimination. Guimaraes admits Grubbs *never* referenced her accent, derisively or otherwise, and she does not identify any other person who witnessed Grubbs's behavior and believed she was mocking Guimaraes's accent. *Cf. Takele v. Mayo Clinic*, 576 F.3d 834, 838-39 (8th Cir. 2009) (holding the plaintiff failed to establish a prima facie case of national-origin discrimination where supervisors compared "his successful completion of a treatment plan to a thousand monkeys getting together to write the Bible," "laughing and joking . . . would abruptly stop when [plaintiff] approached," and plaintiff "heard reference being made to foreigners and someone Ethiopian"), *cert. denied*, 130 S. Ct. 3530 (2010).

b.

Assuming Guimaraes presented a prima facie case, she does not present evidence sufficient for a reasonable jury to find that SuperValu's legitimate non-discriminatory reason for her termination – her performance – was a pretext for unlawful discrimination.

"There are at least two ways [Guimaraes] may demonstrate a material question of fact regarding pretext." *Torgerson*, 643 F.3d at 1047. She may show that SuperValu's explanation is unworthy of credence because it has no basis in fact, or she may show pretext by persuading the court that discriminatory animus more likely motivated SuperValu. *Id.* "Either route amounts to showing that a prohibited reason, rather than [SuperValu's] stated reason, actually motivated" her placement on the PAPs. *Id.*

-15-

Guimaraes argues that several instances support a finding of pretext: (1) her previous positive performance reviews, (2) the subjective nature of the PAP, (3) Grubbs's failure to meet with Guimaraes after she was placed on the PAP, (4) Grubbs's plan to "target" her for termination, as described in the "green card" statement, and (5) conflicting testimony from SuperValu's witnesses related to the investigation of Roberts's allegations. The first four appear to be attempts at showing that SuperValu's stated reason has no basis in fact, and the last appears to be an attempt at demonstrating an actual discriminatory motivation.

First, Guimaraes contends that her previous positive reviews show Grubbs's criticism of her performance has no basis in fact. "[E]vidence of a strong employment history will not alone create a genuine issue of fact regarding pretext and discrimination," but it "can be relevant when considering whether the record as a whole establishes a genuine issue of material fact." *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1020 (8th Cir. 2005). Guimaraes's prior employment record is generally positive. In early 2008, second-level-supervisor Hoffmeyer certified that she was more qualified than all U.S. citizens that applied when her job was posted for her visa renewal. In her last performance review in May 2008, he graded her as "consistently meets expectation" (the middle of five possible ranks), and SuperValu gave her a merit raise in June. *Cf. id.* (finding pretext based in part on the terminated employee's "eleven-year employment history with the Bank, during which she was promoted several times and received numerous salary increases"). Grubbs placed Guimaraes on the first PAP in November. During the six months between the last review and the PAP, the scope of Guimaraes's job increased due to the merger, Grubbs constantly critiqued her performance, and Guimaraes consistently stated her belief she was performing adequately. This is not enough evidence on its own to cast doubt on the stated reason for the PAP, but is relevant when considering the record as a whole.

Second, Guimaraes asserts that the PAPs had no basis in fact because they were subjective and lacked objective measures of her performance and improvement. This court will assume that at least some of these measures are subjective and difficult to measure, but reliance on subjective criteria is not enough on its own to prove pretext. *See* **Torgerson**, 643 F.3d at 1049-50. A supervisor's assessment of a particular employee's performance is necessarily subjective, and Guimaraes's previous positive reviews relied on similarly subjective criteria. A reasonable jury could find the use of subjective criteria in the PAP relevant, but not sufficient on its own, to raise an inference of discrimination.

Third, Guimaraes says that Grubbs did not follow SuperValu's policies, by "routinely" cancelling meetings and failing to offer "feedback" and "guidance" while she was on the PAP. According to Guimaraes, this failure to follow policy supports the inference that Grubbs was setting her up to fail. This evidence could be relevant in determining whether her performance deficiencies had no basis in fact. However, "[t]he fact that [Grubbs] may have failed to follow human resources policy does not create" a reasonable inference that she was motivated by a discriminatory animus on its own. **Haas v. Kelly Servs., Inc.**, 409 F.3d 1030, 1036 (8th Cir. 2005).

Fourth, Guimaraes argues that the "green card" statement creates a material issue of fact whether Grubbs was targeting Guimaraes for termination and therefore fabricated her critique of Guimaraes's performance. Grubbs allegedly stated that "she was trying to get [Guimaraes] fired," "setting in motion a process to terminate" her, and unhappy with "how long it would take." Grubbs did not mention a plan to lie about her performance in order to cause her termination. Grubbs did not admit that Guimaraes's performance was adequate or that her criticisms were unfounded. However, a reasonable jury could find that Grubbs's alleged plan to target Guimaraes for termination allows the inference that SuperValu's stated reason for placing her on the PAP had no basis in fact.

-17-

Viewing the record as a whole and giving Guimaraes the benefit of all reasonable inferences, a reasonable jury could find that SuperValu's legitimate, non-discriminatory reason for placing her on the PAP has no basis in fact – in light of the sharp decline in her performance reviews, the subjectivity of the PAPs, Grubbs's failure to follow policies during the PAP, and her stated intent to target Guimaraes for termination. Even so, a reasonable jury would not find that Guimaraes meets her "ultimate burden of proof and persuasion that [SuperValu] discriminated against" her based on her national origin. *See Torgerson*, 643 F.3d at 1046; *see also Reeves*, 530 U.S. at 148 ("This is not to say that [a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false] will always be adequate to sustain a jury's finding of liability."); *Strate*, 398 F.3d at 1017 ("[I]n the context of the *McDonnell Douglas* analytical framework, a court's use of the words 'pretext,' 'pretextual' or similar terminology, often must be read as shorthand for indicating that a defendant's proffered discriminatory explanation for adverse employment action is a pretext *for unlawful discrimination*, not that it is merely false in some way."), *citing St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 516 (1993); *Dammen v. UniMed Med. Ctr.*, 236 F.3d 978, 980-81 (8th Cir. 2001) ("[A] showing by the plaintiff that the employer's reason for its decision was a pretext for discrimination will not necessarily insulate the plaintiff from summary judgment."), *citing Reeves*, 530 U.S. at 148.

Guimaraes has not presented sufficient evidence for a reasonable jury to find that Grubbs was "targeting" Guimaraes *because of her national origin*. Examining the evidence as a whole, a reasonable jury could find that Grubbs targeted her for any of these reasons: because of a personality conflict, because Guimaraes critiqued Grubbs's management style, because Grubbs honestly did not believe Guimaraes was competent, or even because Guimaraes was trying to get a green card. However, none of these reasons violate Title VII. "The employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers,

-18-

except to the extent that those judgments involve intentional discrimination." ***Kiel v. Select Artificials, Inc.***, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc), *quoting* ***Hutson v. McDonnell Douglas Corp.***, 63 F.3d 771, 781 (8th Cir. 1995).

Finally, Guimaraes attempts to show that SuperValu was more likely motivated by discriminatory animus by pointing to inconsistencies in the testimony of Grubbs, Hoffmeyer, and Butler: (1) Hoffmeyer wavered on whether he was aware of Roberts's allegation that Grubbs was targeting Guimaraes, (2) Hoffmeyer and Butler remember discussing the allegations with Grubbs, but she denies discussing it with them, and (3) Butler testified that Grubbs was disciplined for discussing Guimaraes's termination with Roberts, but Grubbs denies being disciplined. Guimaraes concludes that the inconsistent testimony implies intentional lying, which in turn implies liability. Viewing the record favorably to Guimaraes, these inconsistencies are not sufficient to show a discriminatory motive. When witnesses for the employer give "completely different" explanations for the decision to terminate an employee, it can give rise to an inference of pretext. *See* ***EEOC v. Trans States Airlines, Inc.***, 462 F.3d 987, 995 (8th Cir. 2006). However, the inconsistent testimony cited by Guimaraes does not go to the reason for her termination (or even to the investigation of *her* claims of discrimination). No reasonable jury could infer a discriminatory animus from the immaterial conflicts in this case without resort to speculation.

The district court's dismissal of Guimaraes's national-origin discrimination claim is affirmed.

B.

Guimaraes claims that Grubbs retaliated against her for complaining that Grubbs was discriminating against her based on her national origin. Title VII makes it "an unlawful employment practice for an employer to discriminate against any of

his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII]." **42 U.S.C. § 2000e-3(a)**. Similarly, the MHRA makes it "an unfair discriminatory practice for any individual . . . to intentionally engage in any reprisal against any person because that person . . . [o]pposed a practice forbidden under [the MHRA]." **Minn. Stat. § 363A.15**. Title VII retaliation claims and MHRA reprisal claims are governed by the same standards. *Pye*, 641 F.3d at 1015 n.13. This court "applies § 2000e-3(a) broadly to cover opposition to 'employment actions that are not unlawful, as long as the employee acted in a good faith, objectively reasonable belief that the practices were unlawful.'" *Id.* at 1020, *quoting* ***Bonn v. City of Omaha***, 623 F.3d 587, 591 (8th Cir. 2010).

Because Guimaraes does not offer direct evidence of retaliation, her claim is addressed under the *McDonnell Douglas* framework. To establish a prima facie case of retaliation, she must show (1) she engaged in protected conduct, (2) she suffered a materially adverse employment act, and (3) the adverse act was causally linked to the protected conduct. *Id.* at 1021. Assuming Guimaraes presents a prima facie case of retaliation, she does not present evidence sufficient for a reasonable jury to find that SuperValu's legitimate non-discriminatory reason for her termination – her performance – was a pretext for retaliation in violation of Title VII.

For the reasons listed in Part A, a reasonable jury could find that Grubbs's stated reason for placing Guimaraes on the PAP had no basis in fact. Guimaraes still must present sufficient evidence to meet her "ultimate burden of proof and persuasion" that SuperValu unlawfully retaliated against her. *See* ***Torgerson***, 643 F.3d at 1046.

Guimaraes cites to four pieces of evidence to support a finding of a retaliation: (1) the temporal proximity between the protected conduct and the adverse employment act, (2) Butler's failure to follow company policy while investigating

-20-

Guimaraes's allegations, (3) the circumstances of Roberts's termination, and (4) Grubbs's role as sole decisionmaker.

First, because Guimaraes's report of discrimination followed Grubbs's decision to place her on the PAP, the timing negates a finding of retaliation. Guimaraes admits that the first time she alleged national-origin discrimination was on October 23. Grubbs learned of the complaint the next day. Guimaraes was placed on the first PAP around November 12, less than three weeks later. Initially, it might appear that the temporal proximity can provide some evidence of pretext. *See Sprenger v. Federal Home Loan Bank of Des Moines*, 253 F.3d 1106, 1113 (8th Cir. 2001) (looking "for proximity in conjunction with other evidence" to find pretext). But here, "the employer had been concerned about a problem before the employee engaged in the protected activity." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 1001 (8th Cir. 2011). Grubbs raised concerns about Guimaraes's performance at least as early as August and requested Butler begin disciplinary action on October 3 – three weeks before she was aware of Guimaraes's protected conduct. If not for Butler's wedding, the PAP would have been executed before any complaint of national-origin discrimination.

Guimaraes asserts a genuine issue of material fact whether Grubbs knew of the protected conduct before requesting the disciplinary process. Grubbs testified that she was already aware of Guimaraes's (general) complaints before Butler told her on October 24.[8] For a report of discrimination to be statutorily protected activity under Title VII, it must include a complaint of national-origin discrimination or sufficient facts to raise that inference. *See Helton v. Southland Racing Corp.*, 600 F.3d 954,

---

[8]Later in her deposition, Grubbs says she made a mistake in her earlier testimony and that Guimaraes reported discrimination to her much later. On summary judgment, this court assumes the report was before Grubbs sought to discipline Guimaraes.

-21-

961 (8th Cir. 2010) ("Because [plaintiff] acknowledged that she said nothing in that call about race discrimination, her conversation was not protected conduct under Title VII, and so any conversation taken in response to that conversation cannot be actionable under Title VII."); *see also* **Andonissamy v. Hewlett-Packard Co.**, 547 F.3d 841, 851 (7th Cir. 2008). As noted, Guimaraes admits she did not raise the issue of national-origin discrimination until October 23, and Grubbs specifically testified that the earlier complaint of discrimination had nothing to do with Guimaraes being from Brazil.[9] There is no material issue of fact whether Guimaraes had engaged in protected conduct before Grubbs's request for disciplinary proceedings.

---

[9]Guimaraes cites Grubbs's deposition testimony:

Q:     Okay. Do you recall Ms. Butler telling you in October 2008 that Ms. Guimaraes had complained that you were discriminating against her for being from Brazil? Do you recall that?

A:     Yes.

Q:     Okay. How did you respond to this information that Ms. Butler had informed you of, of complaints that Ms. Guimaraes had?

A:     I was aware of them already from Ms. Guimaraes.

Q:     Okay. Had Ms. Guimaraes told you in the past that she believed you were discriminating against her because she was from Brazil?

A:     Not because she was from Brazil. She had at one point indicated that she felt I was discriminating against her.

. . . .

Q:     Yeah. I just want to know everything you can possibly tell me about that conversation where Ms. Guimaraes indicated to you that she believed you were discriminating against her.

A:     Yeah, I believe it was in a meeting that she had initiated with me prior to her going to Ms. Butler where she was frustrated with the current work situation and she felt overwhelmed by her job duties. In that meeting she proceeded to tell me her opinions of – her personal opinions of me as a manager and indicated that the reason why I – the reason why she was also unhappy is because she feels that I am discriminating against her.

Second, Guimaraes reasons that a reasonable jury could infer retaliation because Butler's investigation of her reports of discrimination was insufficient and did not comply with SuperValu policy. Guimaraes specifically notes that Butler did not document either the report of discrimination or the findings of her investigation and did not speak to anyone other than Guimaraes and Grubbs. SuperValu "can certainly choose how to run its business, including not to follow its own personnel policies regarding termination of an employee or handling claims of discrimination, as long as it does not unlawfully discriminate in doing so." *Haas*, 409 F.3d at 1036. "The appropriate scope of investigation is a business judgment, and shortcomings in an investigation do not by themselves support an inference of discrimination." *McCullough v. University of Ark. for Med. Scis.*, 559 F.3d 855, 863 (8th Cir. 2009). Butler did limit the investigation, but Guimaraes presents no evidence that "she purposely ignored relevant information or otherwise truncated the inquiry" in order to retaliate against Guimaraes for her report of discrimination. *Id.*

Third, Guimaraes believes the circumstances surrounding Roberts's termination raises an inference of retaliatory animus. Roberts thought that Grubbs retaliated against her because she knew about Grubbs's plan to target Guimaraes for termination. Roberts was terminated the same day she sent a lengthy email to an upper-level manager, mentioning Grubbs's plan. SuperValu states that Roberts was terminated for profaning Grubbs and other acts of insubordination. The fact that Roberts subjectively believes she was retaliated against is "not on point" and fails on its own to demonstrate a retaliatory motive as to another employee's termination. *See Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 795 (8th Cir. 2011); *Cherry v. Ritenour Sch. Dist.*, 361 F.3d 474, 480 (8th Cir. 2004); *cf. Gibson v. American Greetings Corp.*, ___ F.3d ___, 2012 WL 686198, at *9 (8th Cir. Mar. 5, 2012) ("A party's unsupported self-serving allegation that her employer's decision was based on retaliation does not establish a genuine issue of material fact."), *quoting Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1088 (8th Cir. 2011), *cert. denied*, 132 S. Ct. 1075 (2012).

Finally, Guimaraes argues that a reasonable jury could find retaliation because the decision to place her on the PAP was solely made by Grubbs, the target of her report of discrimination. Butler and Hoffmeyer did confirm that Grubbs alone initiated placing Guimaraes on a PAP, determined the content of the PAP, and monitored her progress. However, both Butler and Hoffmeyer testified that they reviewed the PAP to determine whether Guimaraes was being held to an appropriate standard for a BSM, and determined that she was.

Viewing the record as a whole, Guimaraes does not, as a matter of law, meet her "ultimate burden of proof and persuasion" that SuperValu unlawfully retaliated against her. *See Torgerson*, 643 F.3d at 1046. That the subject of a discrimination complaint has wide discretion to discipline the complainant could raise an inference of retaliation, but "the evidence taken as a whole is 'insufficient to permit a reasonable jury, without resort to speculation, to draw an inference'" that Grubbs placed Guimaraes on the PAP in retaliation for her report of discrimination. *See Montes v. Greater Twin Cities Youth Symphonies*, 540 F.3d 852, 859 (8th Cir. 2008), *quoting Stewart v. Independent Sch. Dist. No. 196*, 481 F.3d 1034, 1043 (8th Cir. 2007). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The district court's dismissal of Guimaraes's retaliation claim is affirmed.

* * * * * * *

The judgment of the district court is affirmed.

_____