United States Court of Appeals

For the Eighth Circuit

_____

No. 16-3631

_____

Aaron C. Rooney,

*Plaintiff - Appellant*,

v.

Rock-Tenn Converting Company; Rock-Tenn Services, Inc; Westrock Company;

*Defendants - Appellees*.

_____

Appeal from United States District Court
for the Western District of Arkansas - Fayetteville

_____

Submitted: April 6, 2017
Filed: January 9, 2018

_____

Before COLLOTON and BENTON, Circuit Judges, and GERRARD,[1] District Judge.

_____

GERRARD, District Judge.

Aaron C. Rooney was fired and sued his former employer, alleging that he was discriminated against for being male and non-Jewish. But his former employer,

_____

[1]The Honorable John M. Gerrard, United States District Judge for the District of Nebraska, sitting by designation.

Rock-Tenn Services, Inc.,[2] contends that Rooney was fired for poor performance. The district court[3] granted summary judgment for Rock-Tenn. We affirm.

I.

Rooney was hired in March 2010 by Dean Metter, Rock-Tenn's vice-president of business development and key retailers, as an account executive in Rock-Tenn's Bentonville, Arkansas office. Rock-Tenn was in the business of making packaging and displays for retail merchants, and Rooney was responsible for developing and selling in-store displays in the market served by the Bentonville office. One of his primary responsibilities was Rock-Tenn's account with Alcon.

Rooney reported to Metter until September 2013, when Nancy Collom was hired and became Rooney's direct supervisor. But Rooney's November 2013 performance evaluation was still completed by Metter, who gave Rooney an overall rating of 3 out of a possible 5, described as "Met Expectations/Solid Performer." At several points, however, Metter noted issues with office attendance and communication, and Rooney was only rated 2 out of 5 on some aspects of performance affected by those concerns: "Met Most Expectations/Inconsistent Performer." Metter criticized Rooney's "collaborative team work skills" and noted that Rooney did "not communicate effectively in the office," and also noted that Rooney "fights the new office alignment," presumably referring to Collom's hiring.

---

[2]Rooney also named Rock-Tenn Converting Company as a defendant, because he thought that entity was his actual employer. And in 2015, Rock-Tenn Services became WestRock Services as the result of a corporate merger. The distinction is not significant, and we will refer to the defendants collectively as "Rock-Tenn."

[3]The Honorable Timothy L. Brooks, United States District Judge for the Western District of Arkansas.

According to Collom, Rooney was "polite but disrespectful" to her after she became his superior. Collom, like Metter, was dissatisfied with Rooney's communication; in particular, Collom did not believe Rooney kept her sufficiently apprised of his schedule and whereabouts.

The record also reflects issues with the Alcon account. The responses on Alcon's June 2014 Rock-Tenn customer satisfaction survey indicate general satisfaction with Rock-Tenn's performance: although the Alcon representative completing the survey complained about Rock-Tenn's manager at Alcon's site, Jake Kramer, the survey said that Alcon was otherwise "pleased" with the account management. But later that month, Ashley Olson, Alcon's manager for retail displays, emailed Rock-Tenn seeking a "full process review" of Rock-Tenn's operations due to recent problems, and listing the Rock-Tenn employees she expected to attend the meeting at Alcon.

Despite that, quality control and shipping problems persisted. In July 2014, an Alcon job was printed upside-down, and by August, Olson informed Rock-Tenn that because of Rock-Tenn's mistakes, Alcon was in danger of missing its own delivery deadlines to Walmart. And, she wrote, Alcon was losing sales as a result of reduced in-store availability. If an expected delivery wasn't made on time, Olson wrote, Alcon would expect Rock-Tenn to cover any fines Walmart imposed.

Later in August, Metter emailed Rooney about a particular Alcon project, instructing him: "Need to be proactive and push everyday. We want to micro manage this project." But a few days later, Metter wrote in a separate email to Rock-Tenn's human resources director that despite Olson's request to micro-manage the project, "[Rooney] did not follow up per [Olson]'s request." Metter also forwarded an overall assessment of the Bentonville office, which noted Rooney's success in growing the business, but opining that Rooney "is lazy and lacks desire to help grow the local marketplace. His internal communication skills are severely lacking both to his boss

[Collom] and the office. He should be replaced because of attitude but we must find Alcon replacement."

In September 2014, Rock-Tenn failed to deliver Alcon sample products to a trade show. Olson emailed Rooney and Kramer on September 3, making them aware that it was "important that [the shipment] arrive on [September 10]," preferably in the morning, for the September 11 event. But it was discovered on September 10 that the products were damaged, and they hadn't been shipped. At the same time, on September 9, Olson had emailed Rooney and others at Rock-Tenn about a different problem: an unexpected surplus of a particular display was showing in Rock-Tenn's inventory, without explanation. It was discovered that the shipment tracking had been inaccurate, and that the surplus inventory was actually product that had not been delivered. Olson was "baffled how this has happened twice now," and was "really confused" by the oversight. She wrote, "We have to get this under control."

On September 18, Olson emailed Metter complaining, not just about missed shipments (and there were more by then), but about the lack of response from Rock-Tenn to persistent inquiries from Alcon's representatives. Olson wrote that "we have our people working to try to help resolve the issues but that lack of responses is just not acceptable." Rock-Tenn, she wrote, "need[ed] to stop the bleeding with missed shipments and late shipments . . . ." Alcon had been fined three percent of invoice by Walmart for late orders in August and September, and asked Rock-Tenn to reimburse those expenses.

Olson repeatedly emailed Rock-Tenn's representatives–including Metter, Kramer, and Rooney–complaining about Rock-Tenn's failure to respond to Alcon's requests for information and assistance. In late September, there was another delay in shipping Alcon products, occasioned in part by internal questions about production going unanswered. In October, another set of displays that were supposed to have been shipped went missing, and Olson had to email repeatedly because Rock-Tenn's

-4-

investigation into the matter did not proceed promptly. In the end, Metter wrote, "[Alcon] is tremendously frustrated. Key comment is around Alcon is why should we use these folks. They always screw up and they are far away . . . ." Alcon, Metter wrote, "also feels that we do not care about responding quickly."

At around the same time, Metter directed Rooney to move his "base location" to his home, and out of the Bentonville office. Rooney was to be "focused on Alcon" and the move would, Metter wrote, "maximize" Rooney's time. Design activity and project management for Alcon was moved to Rock-Tenn's Winston-Salem office. But the same sort of problems with the Alcon account persisted. On December 19, Olson emailed Rooney to ask when a particular product would be shipped. On January 8, 2015, Olson emailed again asking for an update. Rooney replied, promising updated costs for the project in a few days, to be submitted to Alcon for approval. Olson replied that she did not "understand what [was] taking so long to reprice" because the issue that required repricing "was discovered prior to the holidays." Rooney explained that there had been difficulty "aligning all the team members" and that certain price quotations were running more slowly. Olson replied again–this time including Metter on the email–emphasizing that she did not know why it was taking so long, and asking for the matter to be expedited. Metter promised to take care of the problem.

Metter decided to fire Rooney, and Rooney was fired on February 5. Rooney says he was told he was fired because of "difficulties with interacting with coworkers and failure to support Alcon." But Rooney has a different explanation for why he was fired: he asserts that he was discriminated against by Metter and Collom for not being Jewish, and by Collom for being a man.

To begin with, Rooney testified to his belief that Metter, who is Jewish, had experienced a "Jewish resurgence" and was building a "Jewish empire" at Rock-Tenn that included Collom. According to Rooney, Metter made remarks about networking

with the "Jewish network" of potential customers. Metter also, according to Rooney, described Collom as a "great Jewish lady from Philadelphia" and told Rooney that he would "have to start learning to take direction from a Jewish woman." Rooney also said he overheard Collom and another employee speaking either Yiddish or Hebrew in the office.[4] (Rooney was not sure he could distinguish between the two languages.) And Rooney says that after he was fired he was replaced on the Alcon account by a Jewish employee, while Kramer–who was also Jewish–was transferred to another office instead of being fired for mishandling the Alcon account.

Rooney's gender discrimination argument is premised on several remarks he attributes to Collom. According to Rooney, after she was hired, Collom said that she couldn't "wait until there's more ladies in the office." And after hiring another female employee, Collom said it meant that "we have just as much women in the office as men." When another woman was hired, Collom allegedly said that "the women now overpower the men." And after an office remodel, Rooney claims, Collom similarly remarked that "[n]ow the ladies outnumber the men." According to Rooney, he was replaced on his Starbucks and Walmart accounts by women before he was fired.

After exhausting his administrative remedies, Rooney sued, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and pendant state-law claims. But the district court granted Rock-Tenn's motion for summary judgment, finding that although Rooney had established a *prima facie* case of discrimination based on religion and sex, Rock-Tenn articulated legitimate, non-discriminatory reasons for firing him, and Rooney was unable to show that the reasons proffered by Rock-Tenn were pretexts for discrimination. Rooney appeals.

---

[4]Collom testified that she has not practiced Judaism since she was 12 years old, and that she speaks neither Yiddish nor Hebrew. But for purposes of reviewing summary judgment, the Court gives Rooney the benefit of the doubt.

## II.

We review the grant of summary judgment on each of Rooney's claims *de novo*. *Blake v. MJ Optical, Inc.*, 870 F.3d 820, 825 (8th Cir. 2017). We affirm summary judgment if there is no genuine dispute as to any material fact. *Id*. (citing Fed. R. Civ. P. 56(a)). In assessing whether such a dispute exists, we view the evidence in the light most favorable to Rooney and afford him all reasonable inferences. *Id*. But there must still be enough evidence to allow a rational trier of fact to find for Rooney on the required elements of his claims. *Id.*

More specifically, to survive a motion for summary judgment on a discrimination claim, a plaintiff must either present admissible evidence directly indicating unlawful discrimination, or create an inference of unlawful discrimination under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Cherry v. Siemens Healthcare Diagnostics, Inc.*, 829 F.3d 974, 976 (8th Cir. 2016). Rooney does not contend that he provided direct evidence of discrimination, and the district court proceeded under the *McDonnell Douglas* framework. Under this framework, if an employee carries his burden of establishing a prima facie case of discrimination, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id*. "If the employer meets this burden of production, the employee must then 'prove by a preponderance of the evidence that the legitimate reasons offered by the employer were not its true reasons, but were a pretext for discrimination.'" *Grant v. City of Blytheville, Ark.*, 841 F.3d 767, 773 (8th Cir. 2016) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

Rooney's argument on appeal is essentially twofold. His first argument is procedural: he contends that the district court erred by expanding the non-discriminatory grounds proffered for Rooney's discharge beyond the reasons provided to Rooney at the time he was fired. Second, Rooney contends that the

district court erred in finding Rooney's evidence insufficient to show that those reasons were pretextual.

## A.

First, Rooney argues that the district court impermissibly "depart[ed] from the rubrics of review when it expanded the 'legitimate non-discriminatory reasons for adverse action' beyond the parties' stipulation" that, at the time he was fired, Rooney was told "that the basis of his termination was his 'interaction with coworkers and failure to support Alcon.'" Rooney points to the district court's observation that Rock-Tenn "clearly and specifically articulate[d] a number of reasons for Rooney's discharge, with the main reason being Metter's belief that Rooney's performance was poor." And he takes issue with the court's conclusion that Rock-Tenn "offered numerous legitimate nondiscriminatory reasons for Rooney's discharge, including poor performance, customer complaints, and negative interactions with co-workers." These observations, Rooney suggests, "increased [his] burden of defending against Rock-Tenn's" motion for summary judgment.

But the *McDonnell Douglas* framework is not as narrow as Rooney suggests. While it is true that the district court mentioned some of Rooney's performance issues on accounts other than Alcon, the employer's burden under the *McDonnell Douglas* framework to articulate non-discriminatory reasons for an adverse employment action does not arise when the adverse employment action is taken–rather, it is triggered during litigation, when an employee meets his burden of establishing a *prima facie* case of discrimination. Title VII does not impose a legal obligation to provide an employee an articulated basis for dismissal at the time of firing, and an employer is certainly not bound as a matter of law to whatever reasons might have been provided.

Instead, it is well-established that a employer may elaborate on its explanation for an employment decision. *See Mervine v. Plant Eng'g Servs., LLC*, 859 F.3d 519, 528 (8th Cir. 2017); *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1004 (8th Cir. 2012); *see also Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 835 (8th Cir. 2002). Evidence of a *substantial* shift in an employer's explanation for a decision may be evidence of pretext, but an elaboration generally is not. *Mervine*, 859 F.3d at 528; *Pulczinski*, 691 F.3d at 1004.

So, for instance, in *Smith*, we found no merit to an employee's argument that she had proven pretext by changing its explanation for firing her after the fact. The employee, a secretary for a charitable foundation, argued that she was originally told she was discharged for failing to timely mail donor receipts, but that the foundation's chief executive officer later suggested she was also fired for concealing from her supervisor how behind she was in her work. *Smith*, 302 F.3d at 835. We rejected her argument, explaining that the foundation "certainly did not back off from the original explanation, but only pointed out an additional aspect of the same behavior." *Id*. The foundation's additional evidence was "not different from the reason originally given, but only a slight elaboration of that reason"–and so, it was not a "substantial change" in the foundation's explanation, and was "not probative of pretext." *Id.*

The same is true here: there is no contradiction between the explanation given to Rooney at the time of his termination and the non-discriminatory reasons for termination that Rock-Tenn articulated during this litigation. Rock-Tenn did proffer additional examples of Rooney's poor performance, with clients other than Alcon, "[b]ut this supplemental explanation is not evidence of a substantial shift." *Pulczinski*, 691 F.3d at 1005. "The additional justification is consistent with the company's proffered belief" that Rooney interacted poorly with coworkers and failed to support the Alcon account. *Id*. As such, it is not evidence of pretext.

B.

Rooney also contends that he offered sufficient evidence that Rock-Tenn's proffered reasons for firing him were pretexts for discrimination. His argument is, naturally, focused on the only two reasons for termination he believes were properly articulated–and, as explained above, our inquiry is not so limited. But even as to those two reasons, Rooney has not shown pretext.

An employee may demonstrate pretext by two different methods. *See Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 975 (8th Cir. 2012); *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1052 (8th Cir. 2006). He may show pretext by persuading the Court that retaliatory animus more likely motivated his employer. *See Guimaraes*, 674 F.3d at 975; *Stallings*, 447 F.3d at 1052. Or he may show that the employer's explanation is unworthy of credence because it has no basis in fact. *See Guimaraes*, 674 F.3d at 975; *Stallings*, 447 F.3d at 1052. Either route amounts to showing that a prohibited reason, rather than the employer's stated reason, actually motivated the termination. *Guimaraes*, 674 F.3d at 975.

Rooney argues that Rock-Tenn's explanation is not credible because it has no basis in fact. Beginning with his alleged failure to support the Alcon account, Rooney points to Alcon's general satisfaction with Rock-Tenn's account management team on its June 2014 customer satisfaction survey, and a January 6, 2015 conversation between Metter and Rooney in which Metter said, referring to the Alcon account, that "we're doing much better, and there's no two ways about it[.]"[5] "Rock-

_____

[5]Rooney's brief also asserts that "[o]n or about 06 January 2015, [Alcon Head of Marketing Shawn] Millerick had given Metter a performance evaluation which was very favorable to the account management beyond the on-site position." But to support that assertion, the brief cites to Rooney's testimony that he had seen a favorable performance evaluation. Rooney did not say when he had seen the evaluation, or when it had been completed, and we have found no evaluation in the

-10-

Tenn," Rooney argues, "offered no evidence of any 'failure' on Rooney's part after this date."

But it did: just two days later, Alcon's Ashley Olson had to email Rooney to follow up on a problem that had gone unaddressed for three weeks–a problem that eventually required Metter's intervention. And that came on the heels of the series of mistakes detailed above, all of which came after the generally (but not completely) positive June 2014 customer satisfaction survey. Nothing in Rooney's argument rebuts, or even mitigates, Rock-Tenn's evidence of repeated errors and omissions on the Alcon account, and there is nothing in Rooney's argument to suggest that Rooney was not responsible for the mismanagement.[6]

Next, Rooney contends it was "unworthy of credence," *see Guimaraes*, 674 F.3d at 975, that he was fired for poor interaction with coworkers. But he begins, again, by attempting to narrow Rock-Tenn's explanation: he asserts that "[t]he only co-worker Rock-Tenn identified by name who 'interacted' with Rooney is Nancy Collom[,]" and then limits his argument to Rooney's relationship with Collom. But there are a number of instances in the record in which Rooney was criticized for his

---

record after the June 2014 customer satisfaction survey. The most reasonable understanding of Rooney's deposition testimony is that he was referring to the June 2014 survey. But at the very least, it is clear that Rooney's citation to the record does not support his assertion. *See Roemmich v. Eagle Eye Dev., LLC*, 526 F.3d 343, 352 n.7 (8th Cir. 2008).

[6]Rooney also says he "was surprised by his firing" because there is "no evidence [he] was put on notice that he was in jeopardy of losing his job for 'failure to support Alcon.'" It is not clear why this would demonstrate pretext. But it is interesting to note that Rooney surreptitiously recorded at least two conversations with coworkers in the months before his termination–one relating to supposed discrimination and one relating to his performance on the Alcon account–which would be unusual behavior for someone who did not at least suspect his job might be in the balance.

-11-

failure to communicate with colleagues and poor teamwork. Rock-Tenn was not required to recite an office roll call to rely on those shortcomings as a basis for Rooney's termination.

Even with respect to Collom, Rooney's evidence falls short. Generally, Rooney claims that any conflict with Collom was her fault. But it is important to remember, as we have often said, that a federal court is not a super-personnel department with authority to review the wisdom or fairness of business judgments made by employers. *See Guimaraes*, 674 F.3d at 977; *Stallings*, 447 F.3d at 1052; *Wallace v. Sparks Health Sys.*, 415 F.3d 853, 860 (8th Cir. 2005). The evidence must do more than raise doubts about the wisdom and fairness of the employer's opinions and actions–it must create a real issue as to the genuineness of the employer's perceptions and beliefs. *Hervey v. Cty. of Koochiching*, 527 F.3d 711, 725 (8th Cir. 2008). The instances pointed to by Rooney–that Collom was aggressive towards him, she denied him permission to conduct a project review with a client during an open house, and she should have consulted his Outlook calendar instead of asking him to keep her advised of his schedule–fall well short of creating such an issue.

Finally, Rooney argues his evidence showed that "retaliatory animus more likely motivated his employer" than its stated reasons for firing him, *see Guimaraes*, 674 F.3d at 975, because Jewish and female employees were treated more favorably than he was, and his replacements were either Jewish or female. But to begin with, it is not clear how he was affected by any alleged sex discrimination. Rooney did not dispute that Metter, not Collom, decided to fire him. Rooney has presented no evidence suggesting that Metter harbored any animus toward men. Nor has he presented any evidence supporting a cat's-paw theory of liability, in which an employer may be vicariously liable for an adverse employment action if one of its agents–other than the ultimate decisionmaker–is motivated by retaliatory animus and intentionally and proximately causes the action. *See Bennett v. Riceland Foods, Inc.*, 721 F.3d 546, 551 (8th Cir. 2013); *Guimaraes*, 674 F.3d at 972; *see also Staub v.*

*Proctor Hosp.*, 562 U.S. 411, 422 (2011).[7]  There is no evidence that Collom intentionally and proximately caused Rooney's termination.  And without such evidence, there is nothing to suggest that gender bias was connected to Rooney's firing.[8]

Rooney's contention that Jewish employees were treated more favorably fares no better.  He points to two in particular–Kramer, who he says was removed from the Alcon account and transferred to California instead of being fired, and Mark Benjamin, who he says replaced him on the Alcon account.[9]  But Metter testified that he actually did recommend Kramer's termination–and that later, Kramer was fired.  In any event, Rooney's only argument with respect to Kramer is that Alcon was also dissatisfied with him–and without a record of Kramer's performance in other respects, similar to the evidence presented with respect to Rooney, there is no basis to conclude that Kramer was "similarly situated in all relevant respects" to Rooney.  *See Wallace*, 415 F.3d at 860.  And in the absence of more substantial evidence of discriminatory animus, the fact that Rooney was replaced on one of his accounts by a Jewish man is not enough to create a reasonable inference of discrimination.  *See Tusing v. Des Moines Indep. Cmty. Sch. Dist.*, 639 F.3d 507, 520-21 (8th Cir. 2011).

---

[7]The term is derived from one of Aesop's fables, in which "a monkey induces a cat by flattery to extract roasting chestnuts from the fire.  After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing." *Staub*, 562 U.S. at 415 n.1.

[8]Indeed, at his deposition, Rooney testified that he was "discriminated against" because he wasn't a woman, but that he was *fired* for not being Jewish.  The only adverse employment action placed at issue in this litigation, however, is Rooney's termination.

[9]The parties disagree about whether Benjamin actually replaced Rooney, but Rooney's argument falls short even if he is given the benefit of the doubt on that point.

## III.

In sum, the district court did not err in concluding that Rock-Tenn articulated legitimate, non-discriminatory reasons for firing Rooney, and that he was unable to show the reasons proffered by Rock-Tenn were pretexts for discrimination. The district court's judgment is affirmed.

_____