# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-2055

_____

Ralph Mervine

*Plaintiff - Appellant*

v.

Plant Engineering Services, LLC

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: March 9, 2017
Filed: June 9, 2017

_____

Before WOLLMAN, COLLOTON, and SHEPHERD, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Ralph Mervine appeals from the district court's[1] order granting summary judgment in favor of his former employer, Plant Engineering Services, LLC (Plant

_____

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

Engineering), on his claim of retaliatory discharge in violation of the Minnesota Whistleblower Act (MWA). See Minn. Stat. § 181.932. We affirm.

"We review a grant of summary judgment *de novo* and will affirm when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Grant v. City of Blytheville, 841 F.3d 767, 770 (8th Cir. 2016) (quoting Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc)). We view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Torgerson, 643 F.3d at 1042. The nonmoving party "may not rely on allegations or denials," however, but must substantiate his allegations with "sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation [or] conjecture." Mann v. Yarnell, 497 F.3d 822, 825 (8th Cir. 2007) (quoting Gregory v. City of Rogers, 974 F.2d 1006, 1010 (8th Cir. 1992)). There is no genuine issue for trial if "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Torgerson, 643 F.3d at 1042. We relate the facts in light of these standards.

Plant Engineering provides engineering, project-management, and support services to clients nationwide. It has provided engineering services to Flint Hills Resources (Flint Hills) at its Pine Bend refinery in Rosemount, Minnesota (Pine Bend), for several years. Mervine, an experienced professional engineer, began working for Plant Engineering as a project manager in May 2012. In January 2013, Plant Engineering interviewed Mervine for the position of Pine Bend site manager. Mervine was informed during the interview that Pine Bend was a difficult assignment, that Flint Hills's increased focus on timely project completion was affecting Plant Engineering employees' morale, and that Flint Hills was currently unhappy with the services Plant Engineering employees were providing at Pine Bend. In April 2013, Mervine accepted Plant Engineering's offer. Forty-eight of Pine Bend's 225 projects were more than two weeks behind schedule when Mervine began his employment there.

Mervine understood that his primary task was to accommodate Flint Hills's demands, as well as Bill Hicks's, Plant Engineering's manager for the Flint Hills account. Both Plant Engineering and Flint Hills were initially satisfied with Mervine's performance. In late 2013, Mervine began to have problems with Shaina Botka, a Plant Engineering project manager who reported directly to Mervine and who Mervine believed had become frustrated with Flint Hills's repeated changes to her project schedules. In a December 13 email, Botka claimed that Mervine had told her in a meeting that he needed to "clean house" and that he could fire her and another employee. Botka understood Mervine's comments to be a threat to her employment and informed Mervine in the email that she intended to report his conduct to Jason Kreuiter, Plant Engineering's Pine Bend human resources (HR) representative. Botka also emailed Kreuiter to ask if she could discuss some concerns with him. Later the same day, Mervine forwarded to Kreuiter the email Botka had originally sent to him and asked Kreuiter to call the following week to discuss Botka. Several follow-up emails were sent to Kreuiter over the next several days by both Mervine and Botka, each of whom expressed professional and personal concerns about the other. Kreuiter recognized the strained working relationship between Mervine and Botka, and he spoke with both parties about their concerns. In the meantime, Mervine received a positive annual performance review from his supervisor, Joe Picou, on December 9, 2013, and he received a raise and a promotion in January 2014. Picou, however, was not aware at that time that Botka or any of Mervine's other subordinates had concerns about Mervine.

Also in late December 2013, Plant Engineering began planning for its annual contract negotiations with Flint Hills. In a conference call on the afternoon of January 28, 2014, Mervine, Hicks, Picou, and Kreuiter began to finalize plans for those negotiations. The parties intended to discuss the feasability of seeking an annual rate increase from Flint Hills to cover the cost of a quarterly bonus that Plant Engineering had been paying to certain employees in lieu of a discontinued retirement benefit. During the call, Picou instructed Mervine to request the proposed rate

-3-

increase from Flint Hills. According to Mervine, however, Picou also directed him to conceal from Flint Hills that the proposed increase would be used to cover the cost of the quarterly bonuses. Mervine believed that the rate increase was improper because, as he understood the provisions of Plant Engineering's contract with Flint Hills, Plant Engineering was already collecting fees to cover the quarterly bonuses. Based on this understanding, Mervine stated during the conference call that he believed Picou's proposal constituted illegal double billing. Hicks immediately disagreed with Mervine's statement that the proposal was illegal, but he suggested that Flint Hills was unlikely to agree to a rate increase in any event. Picou, however, responded angrily to Mervine's remark, stating that he did not appreciate Mervine's accusation of illegal behavior, and abruptly ended the conference call after this exchange.

Hicks later told Mervine that Picou was upset about Mervine's comments during the call and that "it w[ould] be a long time before [Picou] [got] over" the incident. A few days after the conference call, Picou called Mervine to apologize for his "outburst" during the call. Picou reiterated, however, that he resented having his ethics questioned. Picou suggested that Mervine had misunderstood what Picou had asked him to do and that the two should meet so Picou could explain the billing and financial terms of Plant Engineering's contract with Flint Hills. Despite Mervine's stated misgivings about the legality of the proposed rate increase, he thereafter agreed to approach Flint Hills to negotiate the increase, writing in a February 3 email to Picou that he was "working on a plan to recover these . . . payments." Mervine had no further discussions with Picou or Flint Hills about the rate increase.

On the morning of January 28, Plant Engineering employee Rick Panzer emailed Kreuiter, asking to discuss "a situation" at Pine Bend. In a phone call later that day, Panzer expressed concerns to Kreuiter about employee morale at Pine Bend, the overall environment at the site, and Mervine's mistreatment of Botka. Because Panzer was "having trouble formulating his thoughts on the call," Kreuiter sent him

an email the following morning, asking him to "summarize any thoughts, experiences or situations" he had "observed or been told about regarding [Mervine's] behavior." Kreuiter also received a brief email from Botka on the morning of January 29, which expressed her continued concern about her job security. As he had done with Panzer, Kreuiter responded by asking Botka to summarize her concerns in an email.

Panzer's January 29 follow-up email to Kreuiter stated that although the situation at Pine Bend had recently improved, Mervine continued to display a lack of professionalism and a limited knowledge of the engineering process that was negatively impacting Plant Engineering's relationship with Flint Hills. The email stated that Mervine had dozed off, made irrelevant and sarcastic comments, and undermined Plant Engineering employees during meetings with Flint Hills representatives. He had abruptly left meetings when his input was needed and had made statements that caused Plant Engineering employees to question their job security. Further, the email stated that Mervine had discussed private employee information in the presence of others and had refused to allow Plant Engineering employees to request changes to Flint Hills project schedules, which Panzer worried would result in missed deadlines. Kreuiter forwarded Panzer's email to Picou and Hicks on January 30, concealing Panzer's identity and describing him only as a long-term employee with no reason to fabricate allegations about Mervine. Hicks responded by email the same day, suggesting that Kreuiter consider visiting Pine Bend to interview Plant Engineering employees in person. Kreuiter discussed the situation with Picou, and the two determined that Kreuiter should travel to Pine Bend and proceed as Hicks had suggested.

On February 3, Botka sent Kreuiter a follow-up email, documenting in detail her numerous concerns with Mervine's performance. Botka wrote that Mervine had again threatened to fire her and had also threatened the jobs of two other Plant Engineering employees, Dave Mannello and Jim Carpenter. She acknowledged that she could not be fired without approval from Plant Engineering and Flint Hills, but

stated that she had been excluded from new work projects for six months and was worried about her future with Plant Engineering. Botka complained that Mervine fell asleep, asked irrelevant questions, and undermined her during meetings with Flint Hills representatives. She also recounted a conversation with Mervine during her annual performance review in which Mervine revealed that he had caused a former employer to be sued for pregnancy discrimination. Botka interpreted Mervine's comment as an inappropriate inquiry into her family plans. Botka stated that Mervine's conduct had gone "far beyond acceptable professional behavior, and [would] potentially jeopardize this contract, and many people's jobs, including my own."

The next day, Kreuiter received an email from another Plant Engineering employee, Charles Sandiford, who described an incident with Mervine that had occurred when Sandiford was leaving work the preceding day. As Sandiford was walking to his car after work, Mervine stopped him to ask about an "anti" holiday party that Sandiford and others in his work group had organized and attended on the same night of the company's previous-week holiday party. Mervine pressed Sandiford for details about the party and the other attendees, which Sandiford felt was "none of [Mervine's] business." Sandiford's email also stated that Mervine had "shown a lack of professionalism towards [him] and countless others" and had "made [Pine Bend] a hostile work environment." It expressed Sandiford's concern that Plant Engineering employees at Pine Bend were "at the end of their rope and [were] consider[ing] going elsewhere unless something gives." Later the same day, Kreuiter received an email from Sandiford's supervisor, Dave Mannello, who stated that Sandiford was very upset about the incident with Mervine. The email further stated that other employees had expressed similar frustrations with Mervine's conduct and that morale was "very bad." Finally, the email stated that never before in his 28 years of experience had Mannello been "subjected to the nonsense" that was occurring at Pine Bend "on a daily basis."

Kreuiter immediately forwarded the content of Sandiford's email to Hicks and Picou, explaining that he had received several similar emails and phone calls complaining about Mervine's performance and management style. Picou informed Hicks that he was concerned about the number and serious nature of the complaints, that resolution of the issues might require more than "coaching, mentoring, or disciplin[ing]," and that he and Hicks thus should consider planning for Mervine's replacement.

On February 12, Kreuiter received an email from Plant Engineering employee Robert Dunlop, who complained that he had been required to serve as the "front man" to resolve "emotional" and "confrontational" issues that Mervine would not address. The following day, Dunlop blind-copied Kreuiter on an email Dunlop sent to Mervine, in which Dunlop referred to "yelling and screaming" coming from Mervine's office after Dunlop had submitted an apparently unsatisfactory seating-chart proposal at Mervine's request. The email explained to Mervine that Mervine's later revisions to Dunlop's original proposal had undermined Dunlop's authority with the other Plant Engineering employees whose input Dunlop had sought in preparing his original proposal.

On February 14, Flint Hills Facilities Manager Don Kern received a telephone call suggesting that he "Google" Mervine's name. Kern did so and discovered reports that described Mervine's alleged connection to the pornography industry and his eventual departure from a position he had previously held with the State of Florida. Kern then called Hicks to ask whether Plant Engineering was aware of these allegations. Hicks responded that Plant Engineering had already begun an investigation into Mervine and that Mervine would not be reporting for work at the Pine Bend facility during the following week's on-site interviews. Kreuiter then called Mervine and instructed him not to report to work the following Monday or Tuesday—instructions that Mervine understood were intended to facilitate Kreuiter's on-site interviews with Plant Engineering employees.

Kreuiter arrived at Pine Bend and began interviewing Plant Engineering employees on February 17, 2014. He interviewed 22 employees, including managers, supervisors, employees who had complained about Mervine, and employees who had not complained. The employees were told that Kreuiter was there to assess "how things [were] going" in general and were not told that the interviews were part of an investigation into Mervine. Each interview lasted about 45 minutes, during which Kreuiter asked no questions intended to elicit negative information about Mervine. Kreuiter later summarized in a report the notes he had made during the interviews. Although some employees approved of Mervine's management style, most reported concerns. Several employees stated that morale was low and that they had little confidence in Mervine's abilities. They reported that Mervine had dozed off and had otherwise behaved inappropriately during meetings with Flint Hills representatives, that he had threatened to fire several employees, that he had failed to maintain employee confidentiality, that he undermined Plant Engineering employees in meetings with Flint Hills representatives, and that he did not support Plant Engineering employees during scheduling discussions with Flint Hills. Notably, Dunlop revealed in his interview with Kreuiter that Mervine had threatened to retaliate against Botka, stating in Dunlop's presence, "I'm going to get that b***h for complaining to HR."

Kreuiter presented a summary of the employee interviews to Mervine and offered him an opportunity to respond to some of the negative comments. Mervine denied most of the allegations, specifically asserting that he had never fallen asleep during a meeting but had only "drift[ed] off" a "couple of times" and that he had never expressed a desire to fire Botka for making a report to HR. Mervine admitted that he had mentioned the pregnancy-discrimination incident during Botka's performance review and that he had questioned Sandiford about the "anti" holiday party, but he denied having asked Sandiford for the names of the other party attendees. Although Mervine was given an opportunity to provide documents or statements supporting his assertions, he did not do so.

After reviewing the employees' allegations and Mervine's responses thereto, Kreuiter determined that it was more likely than not that the allegations were true. Kreuiter considered that, while multiple employees had reported similar, fairly detailed instances of Mervine's misconduct, Mervine had provided only blanket denials. Because Kreuiter had no reason to believe that any of the employees were motivated to fabricate allegations against Mervine, he deemed the employees' allegations more credible than Mervine's denials. Kreuiter reported his findings to Picou and recommended that Mervine's employment be terminated in light of the severity of the Mervine's unprofessional conduct and the risk that several Plant Engineering employees would resign if Mervine continued as the Pine Bend site manager. Picou accepted Kreuiter's recommendation and determined that Mervine's employment should be terminated based on his unsatisfactory job performance, specifically, his "retaliatory activities, [creation of a] hostile work environment[,] degradation of leadership ability, [and lack of] general professional behavior." Picou informed Mervine of that determination on February 20, 2014.

Mervine filed a complaint in Minnesota state court in July 2014, alleging that Plant Engineering had violated the MWA by firing him in retaliation for his statement during the January 28 conference call that Picou's proposed rate increase amounted to illegal double billing. Plant Engineering removed the case to the United States District Court for the District of Minnesota on the basis of diversity jurisdiction. Following discovery, briefing, and oral argument, the district court granted Plant Engineering's motion for summary judgment, concluding that Mervine had not made out a *prima facie* case of retaliation because he had not shown a causal connection between his alleged protected activity and the termination of his employment. The court also concluded that Mervine had not shown that Plant Engineering's stated reason for terminating his employment was a pretext for retaliation. Given these shortcomings in Mervine's case, the district court found it unnecessary to decide whether Mervine's remarks during the January 28 conference call constituted protected activity under the MWA. For the purposes of our decision, however, we

-9-

will assume, without so deciding, that Mervine's January 28 remarks constituted protected activity.

Mervine first argues that the district court erred in concluding that he did not show a causal connection between his protected activity and his termination sufficient to establish a *prima facie* case of retaliation under the MWA. The MWA prohibits an employer from retaliating against an employee who, "in good faith, reports a violation, suspected violation, or planned violation of any federal or state law . . . to an employer." Minn. Stat. § 181.932(1); see also Pope v. ESA Servs., Inc., 406 F.3d 1001, 1010 (8th Cir. 2005), *abrogated on other grounds by* Torgerson, 643 F.3d at 1058. To establish a *prima facie* case under the MWA, Mervine had to show that he engaged in statutorily protected activity, that he suffered an adverse employment action, and that a causal connection existed between the two events. See Pope, 406 F.3d at 1010.

Mervine argues that the brief period of time between his protected activity and his termination—approximately three weeks—supports an inference of a causal connection between the two events sufficient to survive summary judgment. We disagree. Although close temporal proximity between protected activity and termination "may occasionally raise an inference of causation, in general, more than a temporal connection is required." Freeman v. Ace Tel. Ass'n, 467 F.3d 695, 697-98 (8th Cir. 2006) (internal citation omitted); see also Pope, 406 F.3d at 1010 (noting that temporal proximity "without any other circumstantial evidence, fails to raise an issue of material fact regarding causation"); Smith v. Allen Health Sys., Inc., 302 F.3d 827, 833 (8th Cir. 2002) (concluding that thirteen-day interval between protected activity and adverse employment action was "sufficient, but barely so, to establish causation").

We conclude that any inference of a causal relationship between Mervine's January 28 remarks and his February 20 termination was "undermine[d]" by

intervening events, namely, the complaints from Plant Engineering employees about Mervine's misconduct. Freeman, 467 F.3d at 698. As set forth above, the complaints from Plant Engineering employees Botka, Sandiford, Mannello, and Dunlop describing Mervine's misconduct were received by Kreuiter following the January 28 conference call. Plant Engineering's ensuing investigation of those complaints, as well as of Mervine's overall job performance, corroborated the complaints and resulted in additional reports of Mervine's unprofessional conduct.

Mervine asserts that these intervening events should not defeat an inference of causation because the investigation into the employee complaints was engineered by Picou, who Mervine contends had a motive to, and did in fact, retaliate against him. This contention is belied by the record, which shows that it was Hicks, not Picou, who initially suggested that Kreuiter should conduct employee interviews at Pine Bend in response to the email complaints about Mervine.

Whatever causal inference that might have been drawn from the temporal proximity between Mervine's protected activity and the termination of his employment was vitiated by the intervening, later-corroborated employee complaints, as well as by the later-discovered additional misconduct. See id. (noting that plaintiff's admission during the two-week period following his MWA activity that he had lied to his employer about his sexual relationship with a subordinate was among the intervening events that "undermine[d]" an inference of a causal connection); Cheshewalla v. Rand & Son Constr. Co., 415 F.3d 847, 852 (8th Cir. 2005) (noting in Title VII retaliation case that plaintiff's repeated absences from work and employer's reduction in force during the four-week period between the plaintiff's protected activity and her termination were intervening events that "eroded" any inference of a causal connection). Because no rational trier of fact could conclude on this record that Mervine's protected activity was causally connected to his termination, there was no genuine issue for trial. See Torgerson, 643 F.3d at 1042 ("Where the record taken as a whole could not lead a rational trier of fact to find for

the nonmoving party, there is no genuine issue for trial." (citations omitted)). The district court thus did not err in concluding that Mervine failed to satisfy his initial burden of establishing a causal connection between his protected activity and his termination sufficient to establish a *prima facie* case of retaliation under the MWA.

Moreover, even assuming that Mervine had established a *prima facie* case of retaliation, he has not shown that Plant Engineering's stated reason for terminating his employment—unsatisfactory job performance—was pretext for retaliation. Cf. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973) (explaining that if an employer comes forward with a legitimate, nondiscriminatory reason for the adverse employment action, the employee must point to some evidence that the employer's proffered reason is pretextual); see Pope, 406 F.3d at 1010 (applying McDonnell Douglas framework in MWA retaliatory-discharge case). To demonstrate that Plant Engineering's stated reason for terminating his employment was pretextual, Mervine had to present sufficient evidence to create a material "question of fact as to whether [that] reason was pretextual," as well as sufficient evidence to support a "reasonable inference that [Plant Engineering] acted in retaliation." Stewart v. Indep. Sch. Dist. No. 196, 481 F.3d 1034, 1043 (8th Cir. 2007) (quoting Logan v. Liberty Healthcare Corp., 416 F.3d 877, 880 (8th Cir. 2005)). It was Mervine's burden to show that Plant Engineering's stated reason had "no basis in fact" or that Plant Engineering was "more likely motivated" by "a prohibited reason." Gibson v. Geithner, 776 F.3d 536, 540 (8th Cir. 2015). "In determining whether a plaintiff has produced sufficient evidence of pretext, the key question is not whether the stated basis for termination actually occurred, but whether the defendant believed it to have occurred." Macias Soto v. Core-Mark Int'l, 521 F.3d 837, 842 (8th Cir. 2008).

Mervine contends that Plant Engineering's stated reason for terminating his employment is unworthy of belief because Plant Engineering had long possessed knowledge of problems at Pine Bend but did not investigate until Mervine engaged in protected activity. As set forth above, however, Plant Engineering's investigation

into Mervine's misconduct was prompted by the four separate complaints from employees who had no knowledge of Mervine's January 28 remarks. Mervine has offered no plausible evidence that Kreuiter's investigation was a sham or that Picou engineered or manipulated the process or the results to retaliate against Mervine. His allegation that Kreuiter's investigation was biased is belied by the record, for Kreuiter's interview questions were neutral, unbiased, and designed to elicit candid and truthful answers from employees about their overall job satisfaction, general concerns they might have had with management, and their opinions on the state of Plant Engineering's relationship with Flint Hills. Kreuiter's post-investigation summary report documented every comment he received regarding Mervine, not solely the negative responses. See Pulczinski v. Trinity Structural Towers, Inc., 691 F.3d 996, 1005 (8th Cir. 2012) ("The appropriate scope of an internal investigation . . . is a business judgment, and we do not review the rationale behind such a decision.").

Mervine insists that he did not engage in the misconduct described by the employees and that Plant Engineering's reliance on these false reports is thus evidence of pretext. The question, however, is not whether he "actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that [he] was guilty of the conduct justifying [the] discharge." McCullough v. Univ. of Ark. for Med. Scis., 559 F.3d 855, 862 (8th Cir. 2009). Mervine points to nothing in the record suggesting that Kreuiter and Picou did not honestly believe that he had engaged in the misconduct described in the employee complaints and interviews. See id.

Mervine also contends that his positive performance review from Picou in December 2013, a mere two months prior to his termination, is evidence that the stated reason for his termination was pretextual. Mervine has proffered no evidence, however, that Picou, the ultimate decisionmaker in Mervine's termination, was aware of Botka's complaints about Mervine—or of any other problems with Mervine's

performance—at the time he issued the positive performance review. Mervine also argues that pretext may be inferred from the fact that his predecessor at Pine Bend had similar performance issues but was treated more favorably by Plant Engineering. As noted by the district court, however, Mervine's predecessor was having difficulties responding to Flint Hills's project schedules, while Mervine, by contrast, "was accused of creating a hostile work environment, . . . sleeping during client meetings, threatening other employees' jobs, [and] other specific instances" of misconduct, all of which were "documented and corroborated by the 22 interviews Kreuiter completed." Because Mervine and his predecessor did not engage in misconduct of "comparable seriousness," the fact that Mervine was treated differently is insufficient to establish the existence of pretext. See Burton v. Ark. Sec'y of State, 737 F.3d 1219, 1230-31 (8th Cir. 2013).

Mervine contends that pretext may be inferred based on evidence that Plant Engineering's stated reason for terminating his employment has shifted. Evidence of a substantial shift in an employer's explanation for an employment decision may be evidence of pretext, but "an elaboration generally is not." Pulczinski, 691 F.3d at 1004. Plant Engineering has consistently stated that Mervine was terminated because of his unsatisfactory job performance. See Phillips v. Mathews, 547 F.3d 905, 913 (8th Cir. 2008) (concluding that the reference to "an additional aspect of the same behavior" that led to the adverse employment action did not constitute "a substantial change in [the employer's] story, and [was] not probative of pretext" (citations omitted)); Smith, 302 F.3d at 835 (same); cf. Kobrin v. Univ. of Minn., 34 F.3d 698, 703 (8th Cir. 1994) (finding pretext in failure-to-hire case where employer's proffered reason was directly contradictory to the initial reason given to employee). Plant Engineering's descriptions of Mervine's unsatisfactory job performance as unprofessional behavior, creation of a hostile work environment, retaliatory activity, and "degradation of leadership ability," fall within the general category of unsatisfactory job performance and thus do not reflect a substantial shift in Plant Engineering's stated reasons sufficient to establish pretext.

In a similar vein, Mervine contends that Plant Engineering originally cited his alleged involvement in the pornography industry as justification for terminating his employment.  Both Picou and Kreuiter, however, the only individuals involved in the termination decision, testified that the pornography allegations played no role in the decision to terminate Mervine's employment, and we see nothing in the record that calls their testimony into question.

The judgment is affirmed.

_____

-15-